1  STEPHEN YAGMAN
   333 Washington Boulevard
2  Venice Beach, California 90292-5152
   (310) 452-3200
3
4  Presented on behalf of Plaintiff,
   Stephen Yagman, *in propria persona*,
5  in only his individual-capacity

6  JOSEPH REICHMANN (SBN 29324)
   333 Washington Boulevard
7  Venice Beach, California 90292-5152
   (310)452-3200
8
9  Presented on behalf of Plaintiff,
   Stephen Yagman, only in his
10 class- representative capacity, if
   and when a class is certified

11              **UNITED STATES DISTRICT COURT**

12              **CENTRAL DISTRICT OF CALIFORNIA**

13                    **WESTERN DIVISION**

| | |
|---|---|
| **STEPHEN YAGMAN**, <br><br> Plaintiff, <br><br> vs. <br><br> **JESSE K. BRAY**, aka **JAY BRAY**, **CHRISTOPHER MARSHALL**, **NATIONSTAR MORTGAGE HOLDINGS, INC.**, **NATIONSTAR MORTGAGE LLC.**, **MR. COOPER GROUP, INC.**, **NATIONSTAR CAPITAL CORPORATION**, and **TEN UNKNOWN NAMED DEFENDANTS 1-10**, <br><br> Defendants. | **COMPLAINT** <br> (Class Action) <br><br><br> **JURY DEMAND** |

24                 **JURISDICTION AND VENUE**

25        1.  Plaintiff asserts diversity of citizenship claims against all defendants, as

26  all defendants and plaintiff, respectively, are domiciliaries and citizens of different

27  states, plaintiff of New York, and defendants not of New York, and defendants

28  apparently of Texas and of Delaware, and therefore this court has jurisdiction

                                        1

1   pursuant to 28 U.S.C. § 1332(a)(1), since the matter in controversy exceeds the

2   sum or value of $75,000, exclusive of interest and costs, plaintiff also asserts his

3   state law claims based on supplemental jurisdiction, under 28 U.S.C. § 1367, and

4   jurisdiction also is based on 28 U.S.C. § 1331, as a federal claims are asserted for

5   Racketeer Influenced and Corrupt Organizations (RICO) violations.

6           2. Defendants did both general business and case-specific business in

7   California, and the matters that are the bases for this action occurred in Los

8   Angeles County, California, and therefore venue lies in the United States District

9   Court for the Central District of California, and in its Western Division, pursuant to

10  28 U.S.C. § 1391.

**THE PARTIES**

12          3. Plaintiff  is **STEPHEN YAGMAN** (hereinafter "Yagman" or "plaintiff"),

13  and defendants are **JESSE K. BRAY**, aka **JAY BRAY**, chairman, president, and

14  CEO of the following-named defendant entities -- **NATIONSTAR MORTGAGE**

15  **HOLDINGS**, **INC.**, **NATIONSTAR MORTGAGE LLC**, **MR. COOPER**

16  **GROUP, INC.**,  **NATIONSTAR CAPITAL CORPORATION**,

17  **CHRISTOPHER MARSHALL**, CFO of the following-named entities --

18  **NATIONSTAR MORTGAGE HOLDINGS, INC., NATIONSTAR**

19  **MORTGAGE LLC, MR. COOPER GROUP, INC.,  NATIONSTAR**

20  **CAPITAL CORPORATION**, and **TEN UNKNOWN NAMED DEFENDANTS**

21  **1-10**  (hereinafter, and all collectively, "defendants"), who are persons and/or

22  entities whose true names presently are unknown and who may have engaged in

23  some conduct that is culpable with respect to plaintiff, as set forth hereinbelow,

24  and whose true names will be added when they are known.  All counts are asserted

25  against all defendants, who all engaged on the same wrongful conduct.

26  //

27  //

28

1

## ALLEGATIONS COMMON TO EACH AND ALL COUNTS

2

4.  Each and every allegation set forth in each and every averment of this

3

pleading hereby is incorporated by this reference in each and every other averment

4

and allegation of this pleading.  All defendants engaged in precisely the same

5

conduct as to each claim and each count.

6

5.  Plaintiff executed a deed of trust and Note on July 25, 1994 with respect

7

to which plaintiff is the trustor (mortgagor), Countrywide Title Corporation is the

8

trustee, and America's Wholesale Lender is the beneficiary.  Neither Countrywide

9

nor America's Wholesale Lender had the legal ability to do business in California

10

as of July 25, 1994, but plaintiff was unaware of that at that time.  As a result of

11

this, the deed of trust and Note were and are void *ab initio*, and this, in part, is the

12

basis for all of plaintiff's claims based on fraud.

13

6. With respect to that deed of trust, plaintiff granted to the trustee, in trust,

14

the following-described property, located in Los Angeles County, California: lot

15

19, block 22, of shortline beach subdivision number 2 tract, in the City of Los

16

Angeles, County of Los Angeles, State of California, as per map recorded in book

17

4 page 42 of maps, in the office of the County Recorder of said County.

18

7. The deed of trust and Note required that monthly payments be made on

19

the note that is part of the deed of trust, in a sum of approximately over $2,000.00

20

per month.

21

8. Beginning in approximately 2013, defendants, and each and all of them,

22

demanded to plaintiff each and every month that the monthly mortgage payments

23

be paid to defendants, having made more than approximately 95, separate written,

24

and mailed through USPS, demands for such monthly payments, all of which

25

payments have been made via USPS, which demands eventually ceased.

26

9. Defendants did not have any legal right to have made these demands for

27

monthly payments on plaintiff, because defendants were neither the beneficiary of

28

the note and the party on whose behalf they made the demands were not the beneficiary of the deed of trust and did not represent any beneficiary of the deed of trust.

10. Plaintiff was the borrower as to the July 25, 1994 Adjustable Rate Note (the Note).

11. America's Wholesale Lender was the lender, with respect to the Note.

12. The Note never legally was transferred from America's Wholesale Lender to anyone.

13. At the bottom, right hand side of page 5 of the Note, where it states "PAY TO THE ORDER OF _____," the line is blank, so that the Note never was transferred from America's Wholesale lender to anyone, so that only America's Wholesale Lender, and no one else, if anyone, had any potential, legal right to payments on the Note.

14. Any purported transfer of the Note that potentially could have been made did not occur, because there is no transferor signature, as stated in ¶ 13.

15. The Deed of Trust that was executed on the same date as the Note never was transferred.

16. The Deed of Trust could not validly be transferred without the Note having been validly transferred.

17. Neither the Note nor the Deed of Trust ever was transferred to Girard Savings Bank, F.S.B., on July 31, 1996.

18. On July 31, 1996, Countrywide Home Loans, Inc. did not validly or effectively transfer the Note and the Deed of Trust to Girard Savings Bank, F.S.B.

20. On July 31, 1996 Countrywide did not own the Note or the Deed of Trust.

21. As of July 31, 1996, when Countrywide Home Loans, Inc. purported to make the assignment/transfer of the Note to Girard, Countrywide did not own the Note, and therefore could not have and did not make the transfer.

22. On December 5, 1996, there was a purported assignment/transfer of the Deed of Trust, but not of the Note, by First Bank of Beverly Hills, FSB, who claimed to be the beneficiary of the mortgage, and the purported assignment/transfer of the Deed of Trust that stated it "hereby grants, assigns and transfers [it] to: [no name listed] as Assignee, with the address of [no address listed]" did not accomplish any transfer to anyone.

23. First Bank of Beverly Hills, FSB, never owned either the Note or the Deed of Trust.

24. First Bank of Beverly Hills, FSB, never legally could transfer the Note or Deed of Trust to First Boston or to anyone else, to put into the mortgage securitized trust.

25. Ownership of neither the Note nor the Deed of Trust ever passed to the pooling trust, whom defendants contend owned the Note.

26. Defendant mortgage securitized trust never owned the Note.

27. Defendant trustee of the trust, Deutsche Bank, from whom defendants contended they had the legal right to collect payments on the Note, had no legal rights as to the Note.

28. In order to set up a securitized trust, there must be a sponsor, a depositor, and the trust itself.

29. First Bank of Beverly Hills, FSB (FBBH) was in fact the sponsor of the mortgage-securitized trust.

30. In this case, the mortgage pooling agreement set up a separate corporation, Wilshire Mortgage Funding Company IV, Inc. (Wilshire IV), to act as the "unaffiliated seller."

31. In this action, according to the Pooling and Servicing Agreement that established the trust, the "unaffiliated seller" was Wilshire IV, the depositor was First Boston Mortgage Securities Corp. (First Boston), and the trust was Wilshire Funding Corporation Mortgage-Backed Trust 1996-3.

32. According to the pooling agreement, Wilshire IV "ha[d] conveyed the Mortgage Loans to the Depositor, First Boston, pursuant to this Agreement."

33. The third "Whereas" clause of the pooling agreement indicated that the pooled mortgage loans were transferred first to First Boston, prior to or at the time the pooling agreement was entered into, on December 1, 1996.

34. The pooling agreement also indicated that, on December 1, 1996, Wilshire IV purported to enter into an agreement with Wilshire Credit Corp., First Bank of Beverly Hills, and Girard Savings Bank, for the purpose of acquiring a portfolio of mortgage loans, including plaintiff's loan.

35. The Assignment document indicates that First Bank of Beverly Hills did not make the assignment of the mortgage loans until December 5, 1996, or four days after entry into the pooling agreement.

36. That notarized Assignment does not show the name and address of any assignee, so that no transfer/assignment ever could have occurred or ever did occur.

37. As of December 1, 1996, Wilshire IV had nothing to sell, assign, or transfer, and could not have sold, transferred, or assigned anything, insofar as plaintiff's Note or Deed of Trust are concerned.

38. First Bank of Beverly Hills would have had to transfer the notes and deeds of mortgage to Wilshire IV, the seller, on or *before* December 1, 1996, or there was a fraudulent representation in the pooling agreement and an ineffective transfer, because one cannot effectively transfer that which one neither owns nor has, and the misrepresentation of ownership was false and/or fraudulent.

39. As of December 1, 1996, First Boston could not have owned and did not own the mortgage loans, as is claimed in the pooling agreement, 15-2, p. 23, because there had been no assignment/transfer of the mortgage loans by First Bank BH until after December 1, and until December 5, 1996.

40. Plaintiff's loan is indicated on a First Boston ARM Loan Schedule dated January 27, 1997 as being a part of the trust, Group 2.

41. The ARM Loan Schedule contains at least 360 loans to 360 persons.

42. For plaintiff's loan, a balance, as of December 1, 1996, is indicated.

43. This indicated balance states falsely and fraudulently that plaintiff's loan was a part of First Boston's mortgage portfolio, as of December 1, 1996.

44. Plaintiff's loan was *not* part of First Boston's mortgage portfolio on December 1, 1996, because First Bank Beverly Hills had not yet assigned the mortgage portfolio to Wilshire IV.

45. The mortgage trust had 90 days within which to transfer the mortgage loans into the trust.

46. The transfer could not have occurred within those 90 days, because plaintiff's loan was not owned by First Boston, the depositor, on December 1, 1996.

47. The trust specifically, and falsely, recites, in its third "Whereas" clause, that the "Seller [Wilshire IV], pursuant to the Unaffiliated Seller's Agreement, has conveyed the Mortgage Loans to the Depositor [First Boston], and [that] the Depositor, pursuant to this Agreement, will deposit the Mortgage Loans to the Trust."

48. The misstatement in the pooling agreement of the date that the depositor acquired the mortgage portfolio means that the purported transfers/assignments to the trust were void *ab initio* and void.

49. A schedule of pooled mortgages was required to have been attached to the pooled loan agreement, and it must have clearly and specifically identified each mortgage as among those assigned.

50. The First Boston ARM Loan Schedule is dated January 22, 1997, and it could not be the schedule of pooled mortgages required to have been attached to the December 1, 1996 pooling agreement.

51. There never were and there are no documents in existence showing the transfer of the portfolio of mortgage loans from First Bank of Beverly Hills to Wilshire IV.

52. There are no documents showing the sale of the mortgage portfolio from Wilshire IV to First Boston.

53. There are no documents showing the sale of the portfolio by First Bank Boston, the depositor, to the trust.

54. No defendant ever legally was a servicer of plaintiff's Note.

55. No defendant ever legally was a servicer for the securitized trust.

56. The trust did not have legal title to the Note or the Deed of Trust.

57. No defendant had any legal right to or interest in plaintiff's Note or Deed of Trust.

58. No defendant had any legal right to demand monthly payments on the Note.

59. Defendants, and each of them, knew that none of them ever had any legal right to demand payments on the Note, their demands were factually and legally baseless and false, all defendants intended that plaintiff would rely on their demands, plaintiff relied on the demands, plaintiff made at least 85 payments on the Note, in reliance on the demands, and plaintiff was injured and damaged by having had to make, monthly payments to defendants, in a sum in excess of $175,000.00.

60. All of defendants' material representations were false and misleading.

61. All defendants intended their material representations to be false and misleading.

62. All defendants intended that plaintiff rely on all of defendants' material misrepresentations.

63. Plaintiff reasonably relied on and was extorted to rely on all of defendants' representations.

64. In reliance on all of defendants' material representations, plaintiff made monthly payments to defendants.

65. Plaintiff was injured and damaged by defendants' demands for payments and by the payments he made to defendants, in a sum of at least $175,000.00.

66. Plaintiff was harmed both by his reasonable reliance on all defendants' material misrepresentations and by plaintiff paying money to defendants.

67. Having devised or intending to devise a scheme or artifice to defraud or for obtaining money by means of false or fraudulent pretenses, representations, and/or promises, all defendants transmitted or caused to be transmitted by means of wire and/or United States Postal Service mail, in interstate commerce, writings and words for the purpose of executing their scheme or artifice, as follows: for each of the months 2013 through and including Feb. 2021, all defendants made monthly demands that plaintiff pay to all defendants plaintiff's money, to which defendants had no claim of right or right.

68. The Nationstar defendants have a mortgage portfolio of well over five hundred billion dollars, annual revenues of over two billion dollars, three million customers, and over nine thousand employees.

69. All defendants' wrongful conduct, as set forth both hereinabove and hereinbelow, constituted extortion, in that it was intended to and did obtain plaintiff's property, his money, with his consent, but induced by all of defendants' wrongful threats that, unless the money was paid by plaintiff to defendants, there

9

would be foreclosure on plaintiff's property that secured the Note and was subject to the Deed of Trust, and this instilled fear in plaintiff and also made plaintiff regularly feel anxious, made plaintiff regularly worry, caused plaintiff to lose sleep, caused plaintiff to be frustrated, and caused plaintiff to experience some physical injuries.

70. Especially, plaintiff's years'-long attempts to obtain from defendants, and their predecessors accurate information and documentation concerning the provenance of the Note and Deed of Trust, caused  fear in plaintiff and also made plaintiff regularly feel anxious, made plaintiff regularly worry, caused plaintiff to lose sleep, caused plaintiff to be frustrated, and caused plaintiff to experience some physical injuries.

71. Plaintiff's state law claims are asserted as both diversity and supplemental claims.

72. All acts and/or omissions perpetrated by each defendant were engaged in maliciously, callously, oppressively, wantonly, recklessly, grossly negligently, with deliberate indifference to the rights allegedly violated, despicably, and with evil motive and/or intent, all in disregard of the plaintiff's rights.  Plaintiff herby incorporates by this reference the legal principles set of punitive damages set forth in *Dang v. Cross*, 422 F.3d 800 (9th Cir. 2005).

73.-125. Reserved.

## COUNT 1

### (Fraud)

126.  By doing the things alleged hereinabove, defendants committed fraud, both fraud in the factum and fraud in the inducement, by concealing correct material information from plaintiff, as to their legal right to demand money from plaintiff, and by making material misrepresentations that were false, defendants intended plaintiff  to rely on those non-disclosures and material misrepresentations,

plaintiff justifiably relied on them, plaintiff was harmed and damaged by his reasonable reliance, and defendants therefore are liable to plaintiff for damages for fraud.

127. One of those material misrepresentations was that Countrywide and America's Wholesale Lender had the legal capacity to enter into the initial loan/mortgage transaction with anyone in California, including plaintiff.

128. Another of those misrepresentations was that defendants lawfully possessed the legal ability to demand payments on the Note, notwithstanding that various links in the chain of title of the Note were legally inoperative; and notwithstanding defendants' knowledge of these legally inoperative links defendants nevertheless demanded and received payments on the Note.

129.-140. Reserved.

## COUNT 2
### (Racketeering - RICO)

141. By doing the things alleged hereinabove, defendants thereby committed wire fraud and/or mail fraud on at least 85 separate occasions, by using instrumentalities of interstate commerce to accomplish their crimes, and thereby all defendants are liable under the Racketeer Influenced and Corrupt Practices Act, civil RICO.

142. Each defendant, in its own right, and all defendants are together, collectively, as well as their employees, who work in and for each defendant company, both enterprises and associated-in-fact enterprises, within the meaning of 18 U.S.C. 1961(4), and therefore are RICO enterprises.

143.  As regards the dealings alleged in the instant action, each different defendant and/or company is, and the companies that are defendants together are, an enterprise(s), within the meaning of 18 U.S.C. § 1961(4).

144. Each company defendant's activities are a significant part of and affect interstate commerce.

145. Each defendant received income, directly and/or indirectly, by way of profits, salary, compensation, benefits, reimbursement for expenses, *per diem* costs reimbursements, meals, lodging, and/or travel, *etc.,* from the pattern of racketeering activity alleged herein, and used that income in the acquisition of an interest in and/or operation of the enterprise, in violation of 18 U.S.C. 1962(a), and acquired and/or maintained control over said racketeering enterprise(s) through a pattern of racketeering activities, as set forth herein, in violation of 18 U.S.C. 1962(b).

146. Defendants conducted and/or participated in said enterprises' affairs through a pattern of racketeering activities, in violation of 18 U.S.C. 1962(c).

147.  The pattern of racketeering activities included a continuous pattern and practice potentially involving activities, including any potential civil RICO predicates, set forth in the RICO predicate statutes, including mail fraud, wire fraud, fraudulent concealment, fraud, extortion, both state law and federal, and potentially obstruction of justice, and defendants' defense of the instant action will be a continuation and a part of their RICO schemes, so that anyone who participates it that defense will become part of the RICO enterprise(s). That pattern of racketeering activities is continuing to date and will continue unless this court ends it.

148. The enterprises' activities occurred on more than one, and on many occasions, at least 85, over at least the past 10 years, have been done on numerous occasions, and constitute at least 85 separate, non-continuous acts.

149. The wrongful acts described in the matters enumerated hereinabove occurred over a significant period of time, and are related in that they evidence civil RICO predicates, including at least fraud, wire fraud, mail fraud, extortion,

both state and federal, and potentially obstruction of justice, and those acts pose a threat of continued criminal activity, they have the same or similar purposes, results, participants and kinds and categories of participants, victims, methods of commission, and are otherwise interrelated by their common characteristics, are not isolated events, and each and all constitute a continuing pattern of racketeering activity, and constitute a long term threat of continuing racketeering activity.

150. These wrongful acts over a period of years, and the bad acts alleged hereinabove, enabled defendants to acquire and maintain, both directly and indirectly, interests in and control of the racketeering enterprises in which they engages.

151. The activities led to defendants' control of and acquisition over the enterprise(s) and resulted in the injuries to plaintiff, as alleged herein, which resulted from defendants' participation in and control of the enterprises.

152. By failing to prevent the wrongful conduct herein alleged, misconduct that amounted to racketeering activities, all managerial and non-managerial employees and/or officers of defendants, engaged in and condoned racketeering activities, and perhaps their attorneys in the instant action, and when the names of the managerial and non-managerial persons, presently Unknown Named Defendants are obtained, the names of those persons will be added as defendants.

153. The willful and/or negligent and/or grossly negligent mismanagement of the enterprises, with knowledge by defendants charged with management and potentially other defendants that they were and continue to be operated as a RICO enterprises, directly caused the harm to plaintiff, as alleged herein.

154. The acquisition of control of the enterprises by its participants who engaged in RICO predicate acts harmed plaintiff.

155. The enterprises are RICO enterprises because they have hierarchical structures and consensual structures for making decisions, and those structures

13

have an existence beyond that which is necessary to commit the RICO predicate acts alleged herein, in that the hierarchical and consensual structures exist to accomplish doing business, and the structures for decision-making exist separate and apart from the racketeering activities.

156.  Plaintiff was harmed in that his property, to wit, his money and money in which he had an interest, was subjected to, affected by, and its value affected negatively by defendants' wrongful conduct, including fraud, wire fraud, mail fraud, deception, extortion, both state and federal, and obstruction of justice.

157. Both directly and indirectly, defendants, in the acts and instances alleged herein, and others, have conducted the RICO enterprises' affairs and have, as a matter of fact, participated in the operation and *de facto* management of the RICO enterprises.

158. By the conduct alleged herein, each defendant participated in the operation and management of the RICO enterprises himself and/or itself, or herself and played some part in directing their affairs.

159.  All persons who are similarly-situated to plaintiff, by virtue of their mortgages being listed on the ARM, whose mortgages allegedly were transferred by the same alleged means as plaintiff, and for whom class certification will be sought, have RICO claims against defendants.  There are many hundreds of such similarly-situated persons.

160.  Plaintiff has suffered a loss of and a material diminution in the value of his property, to wit, his money or money in which he had an interest, and thus plaintiff was injured in his business or property by economic loss, and also defendants harmed plaintiff by interference with plaintiff's prospective business relations, because plaintiff was unable to use his money that defendants extorted plaintiff to pay to defendants.

161. Defendants unlawfully engaged in the racketeering activities on other occasions during the past 10 years, through a pattern of racketeering activity, and acquired, directly and indirectly, control of the enterprises, and also engaged in the same conduct as to other victims.

162. Defendants and others, who either are or have been employed by or who are associated with the racketeering enterprises, have conducted those enterprises through a pattern of racketeering activity.

163. Through a pattern of racketeering activities, as set forth hereinabove, defendants acquired and/or maintained, directly and/or indirectly, interests in and/or control of the RICO enterprises and their activities by, among other things, their own aggrandizement that flows therefrom.

164. By virtue of the allegations set forth hereinabove, some defendants were or are employed by, all defendants were or are associated with, and all defendants participated in, directly and/or indirectly, the RICO enterprises.

165. Defendants unlawfully conspired among themselves and with others, to violate the provisions of 18 U.S.C. 1962(b), (c), and (d), and, on information and belief, continue to do so, with the aid and assistance of co-conspirators

166. Because plaintiff was injured in his property and by reason thereof, plaintiff is entitled to RICO damages, to be trebled.

167. The wrongful policies and practices of defendants relating to the collection of mortgage payments constitute deliberate failures to make honest and truthful disclosures and of making material misrepresentations, and have been formulated and implemented by defendants, singly, jointly, and severally.

168. Defendants' actions involved and involve thousands of consumers of mortgage products and constitute a pattern of racketeering activity, and the predicate acts of wire fraud and mail fraud, in violation of 18 U.S.C. § 1343, both

1   as to plaintiff and as to others with respect to whom class certification will be

2   sought.

3                                    **COUNT 3**

4                                    (Extortion)

5        169. By threatening the foreclosure on the Note and of the subject property,

6   unless plaintiff made the monthly payments that defendants demanded from

7   plaintiff, each and every defendant thereby extorted the monthly payments from

8   plaintiff, under both state and federal law, by forcing plaintiff to provide the

9   monthly payments to defendants under threat, and these threats were made by

10  defendants using USPS mail and by telephone.

11                              **CLASS ALLEGATIONS**

12       170. Plaintiff is a member of the discrete class of persons whose defining

13  characteristic is that its members were persons from whom defendants demanded

14  monthly mortgage payments, but which payments defendants do not have a legal

15  right demand or to receive, because defendants are not the beneficiary of any note

16  and do not collect on behalf of a legal beneficiary.

17       171. This class contains over 360 members, and the class is so numerous so

18  that joinder of all members is impracticable.

19       172. Because only defendants know the names of all of the members of

20  class, and defendants are the only persons who have information sufficient to

21  identify all the members of class, it therefore is impracticable to join all the

22  members of the class in this action.

23       173. There are only common questions of fact and law with respect to all

24  class members.

25       174. The claims made by the representative party, plaintiff, are typical of the

26  claims of each class member, and in fact and law are the same claims.

27

28

175. The representative of the class, plaintiff, through his legal counsel, fairly, vigorously, and zealously will represent and adequately protect the interests of all class members.

176. Prosecution of separate actions by individual class members would create a risk of inconsistent and/or varying adjudications with respect to class members, which would establish incompatible standards for parties opposing the class, and defendants have acted and will continue to act on grounds generally applicable to every class member, and the class questions not only predominate but are the only questions that exist.

177. Therefore, this action is maintainable under F.R. Civ. P. Rule 23(a), & (b)(1)(A),(B)(1),(2), and (3).

178. It is not presently possible accurately to measure the size of the class.

179. The nature of the notice to be provided to class members should be as follows:  defendants should be required to identify all members as defined and to provide a suitable notice to all class members.

180. The definitions of Sub-Classes are as follows:

Sub-Class 1: all persons who are listed as Borrowers on CS First Boston ARM Loan Schedule for Wilshire 96-3 and from whom defendants demanded monthly payments as a servicer: Group 2, to the extent that, similarly to plaintiff, the loans were made by America's Wholesale Lender and never validly were transferred to the mortgage securitized trust known as Wilshire Funding Corporation Mortgage Backed Certificates, Series 1996-3, for whom Deutsche Bank purports to be trustee;

Sub-Class 2: all persons who are listed as Borrowers on CS First Boston ARM Loan Schedule for Wilshire 96-3 and from whom defendants demanded monthly payments as a servicer: Group 1, to the extent that, similarly to plaintiff, the loans were made by America's Wholesale Lender and never validly were

transferred to the mortgage securitized trust known as Wilshire Funding Corporation Mortgage Backed Certificates, Series 1996-3, for whom Deutsche Bank purports to be trustee; and,

Sub-Class 3: all persons who are listed as Borrowers on CS First Boston ARM Loan Schedule for Wilshire 96-3 and from whom the Nationstar defendants demanded monthly payments as a servicer: all Groups other than Groups 2 and 3, to the extent that, similarly to plaintiff, the loans were made by America's Wholesale Lender and never validly were transferred to the mortgage securitized trust known as Wilshire Funding Corporation Mortgage Backed Certificates, Series 1996-3, for whom Deutsche Bank purports to be trustee.

181.-199. Reserved.

## DECLARATORY AND INJUNCTIVE RELIEF

200. Plaintiff seeks a declaratory judgment that defendants had no legal right to have demanded payment of or to collect monthly payments from plaintiff and/or from any class members.

201. Plaintiff seeks a declaratory judgment that defendants engaged in fraudulent debt collection practices, as set forth hereinabove, and an injunction barring such practices in future.

202. Plaintiff seeks both preliminary and permanent injunctive relief that defendants be prohibited from demanding monthly payments and be prohibited from accepting monthly payments from any class members.

203. Plaintiff's and class members' benefits from the declaratory and injunctive relief would be more than $75,000.00, and defendants' detriment would be over $1,000,000.00 per annum.

**WHEREFORE**, plaintiff requests relief against each defendant as follows:

1. General damages to be determined, in a sum exceeding $75,000.00, exclusive of interest and costs;

2. Punitive damages, in a sum to be determined by a jury, and as a percentage of the net worth and yearly profits of all defendants, in a sum sufficient to deter future misconduct, and not less than $100,000,000.00 against defendants;

3. The trebling of all damages for the RICO violations;

4. Costs of suit and interest;

5. Attorneys' fees;

6. Declaratory relief as set forth;

7. Injunctive relief as set forth;

8. Class certification;

9. The same relief as sought above for each class member; and,

10. Such other relief as is just and proper.

## JURY DEMAND

Plaintiff demands trial by jury of all issues and class members demand trial by jury of all issues.


**STEPHEN YAGMAN**,
only in his individual capacity and as to
individual-capacity allegations, and not as
a class representative


**YAGMAN & REICHMANN**


By: _____/s/_   Joseph Reichmann
**JOSEPH REICHMANN**,
only as to plaintiff's class-representative
status, and not as to plaintiff's individual-
capacity allegations or claims